# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

v.                                                **Case No. 05-CR-320**

**MAURICIO JIMENEZ-DeGARCIA**
    **Defendant.**

## SENTENCING MEMORANDUM

Under so-called "fast-track" programs, aliens who illegally re-enter the United States after deportation are able to receive reduced sentences if they quickly plead guilty and agree to uncontested removal. See generally Jane L. McClellan and Jon M. Sands, Federal Sentencing Guidelines and the Policy Paradox of Early Disposition Programs: A Primer on "Fast-Track" Sentences, 38 Ariz. St. L.J. 517 (Summer 2006); Erin T. Middleton, Fast-Track to Disparity: How Federal Sentencing Policies Along the Southwest Border Are Undermining the Sentencing Guidelines and Violating Equal Protection, 2004 Utah L. Rev. 827. These programs were initially implemented in order to allow busy border districts to process more immigration offenders. However, they have since been extended to other places not commonly thought of as hotbeds of illegal immigration, such as Idaho, Nebraska, North Dakota and the Western District of Washington. See United States v. Peralta-Espinoza, 383 F. Supp. 2d 1107, 1108 n.1 (E.D. Wis. 2005).[1]

---

[1] According to the Sentencing Commission's statistics, the district court in Idaho sentenced sixty-four immigration defendants in fiscal year 2006. By comparison, the Southern District of Texas handled 4132 such cases in FY 2006. Utah, which does not have a fast-track program, see McClellan and Sands, supra, at 531, handled 264 immigration cases in FY 2006. See http://www.ussc.gov/ANNRPT/2006/SBTOC06.htm (last visited April 2, 2007).

As may be expected, immigration defendants apprehended in districts without such programs have argued that they, too, should be able to receive reduced sentences if they enter fast pleas and agree to removal. Denial of such a reduction, the argument goes, produces unwarranted sentencing disparity. See 18 U.S.C. § 3553(a)(6) (stating that the sentencing court must consider "the need to avoid unwarranted sentence disparities between defendants with similar records who have been found guilty of similar conduct"); see also United States v. Bonnet-Grullon, 53 F. Supp. 2d 430, 435 (S.D.N.Y. 1999), aff'd, 212 F.3d 692 (2d Cir. 2000) (stating that "it is difficult to imagine a sentencing disparity less warranted than one which depends upon the accident of the judicial district in which the defendant happens to be arrested").

In United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 963 (E.D. Wis. 2005), I imposed a sentence below the guidelines based, in part, on fast-track disparity.[2] Other judges likewise concluded that, post-Booker, this was the sort of disparity that warranted a below-guideline sentence under § 3553(a)(6). See, e.g., United States v. Santos-Nuez, No. 05 Cr. 1232, 2006 U.S. Dist. LEXIS 32493, at *11-12 (S.D.N.Y. May 22, 2006) (collecting cases); United States v. Santos, 406 F. Supp. 2d 320, 324-26 (S.D.N.Y. 2005).[3] This basis for a below-guideline sentence seemed to catch on even amongst those judges who, post-Booker,

---

[2] The primary point of Galvez-Barrios was that the 16 level enhancement contained in U.S.S.G. § 2L1.2(b)(1)(A) sometimes produced sentences that were greater than necessary. 355 F. Supp. 2d at 961-63. Unfortunately, this point received less recognition than the fast-track disparity issue.

[3] Subsequently, several courts of appeals concluded that, because Congress approved of fast-track programs, any disparity they created was not unwarranted. See, e.g., United States v. Mejia, 461 F.3d 158, 163 (2d Cir. 2006) (collecting cases); United States v. Galicia-Cardenas, 443 F.3d 553, 555 (7th Cir. 2006).

2

continued to follow the guidelines in virtually all cases. The argument appealed to the now-ingrained belief that avoidance of disparity should be the primary goal of sentencing.[4]

However, like all mechanistic sentencing schemes, fast-track programs can result in sentences that fail to satisfy the purposes of sentencing in individual cases. The present case presented an example of how such programs failed to promote respect for the law and deter future re-entries.[5]

---

[4]As another judge in this district explained in granting such a departure:

> [I]t is incumbent upon this Court to mete out a fair and just sentence that comports with the mandate of Congress in fashioning sentences that are not only reasonable, but uniform.
> . . .
> In other words, if it is good for Arizona, California, New Mexico, Texas and the State of Washington, and there may be other districts including Florida, it ought to be applied uniformly across the land, and hence forward, my sentences in these or other cases where there is truly a disparity that would exist if the Court chose to literally follow the guidelines in good conscience I cannot do so because to do so would ignore one of the fundamental purposes of why it is we have sentencing guidelines in the first place.

United States v. Abdiel Ricardo Cortez-Monzalbo, No. 04-CR-223, sen. tr. at 20-21 (E.D. Wis. Mar. 18, 2005). It is true that avoidance of "unwarranted disparity" is a factor the court must "consider" in imposing sentence. 18 U.S.C. § 3553(a)(6). However, the statutory "purposes" of sentencing with which the court must "comply" are just punishment, deterrence, protection of the public and rehabilitation of the defendant. 18 U.S.C. § 3553(a)(2). Moreover, it is important to understand that § 3553(a)(6) does not advocate uniformity in sentencing. Rather, it counsels against unwarranted disparity, i.e. those disparities lacking justification under the factors set forth in § 3553(a). See United States v. McGee, No. 06-CR-140, 2007 U.S. Dist. LEXIS 19410, at *9-10 (E.D. Wis. Mar. 19, 2007).

[5]Of course, the federal sentencing guidelines are the most prominent example of a rigid, mechanistic sentencing scheme. As I have noted in other cases, because they largely ignore the individual characteristics of the defendant, the guidelines often produce sentences that are unnecessarily long. See, e.g., United States v. Ranum, 353 F. Supp. 2d 984, 986 (E.D. Wis. 2005). The present case presented a situation in which the mechanical processing of an immigration offender pursuant to fast track programs produced sentences too short to satisfy the purposes of sentencing.

3

## I. FACTS AND BACKGROUND

Defendant Mauricio Jimenez-DeGarcia was born in Mexico in 1974. He first (illegally) entered the United States in 1991 for economic reasons. On February 1, 1993, defendant was convicted of felony assault with a firearm in California state court and sentenced to five years in prison. Immigration authorities ordered that he be deported on July 31, 1995, and physically removed him on September 3, 1995.

Defendant quickly re-entered the United States, and on February 18, 1996, he was found in California after a traffic stop. The government charged him with being a deported alien found in the United States, and the District Court for the Eastern District of California sentenced him to 24 months in prison on April 4, 1997, apparently pursuant to a fast track program. See Galvez-Barrios, 355 F. Supp. 2d at 963 (explaining that, under California's program, defendants otherwise subject to twenty year statutory maximums were allowed to plead guilty to an offense carrying a two year maximum). Upon completion of this sentence, the government removed defendant on July 31, 1998.

Defendant did not remain in Mexico for long. Although it is unclear precisely when he came back, he apparently made his way to Milwaukee this time, where he married in 2001. On July 11, 2002, City of Milwaukee police officers, responding to a shots fired complaint, attempted to pull defendant over.[6] Rather than complying, defendant led the officers on a 50 mph chase through City streets, during which one of his passengers threw a handgun out of the window of defendant's truck onto a sidewalk filled with pedestrians. Fortunately, the gun did not discharge and no one was hurt. Officers eventually apprehended defendant, and state

---

[6]According to one of his passengers, defendant had been drinking and fired a gun into the air several times to "make noise."

4

authorities later charged him with fleeing, disorderly conduct involving the use of a dangerous weapon and felon in possession of a firearm. State authorities released defendant on bond, but he failed to appear in court in December 2002 and a bench warrant issued.

Defendant apparently returned to Mexico after his release by the state, for on October 28, 2003, he was arrested wading across the Rio Grande River attempting to re-enter the United States. The government charged him with improper entry by an alien in the Southern District of Texas, and he was sentenced to 70 days in jail, again ostensibly pursuant to a fast track disposition. Defendant was physically removed from the United States on January 9, 2004.

Defendant came back yet again, perhaps that same month,[7] and was arrested in Milwaukee in July 2004 on the 2002 bench warrant. State authorities notified Immigration and Customs Enforcement ("ICE") of defendant's presence, and on November 12, 2004, ICE agents interviewed defendant in the Milwaukee County jail, leading to the December 2005 issuance of the instant indictment charging defendant with unlawful re-entry after deportation subsequent to his conviction of an aggravated felony, to wit, the 1993 California assault with a firearm case. 8 U.S.C. §§ 1326(a) & (b)(2). On January 6, 2006, a state court sentenced defendant to two years confinement on the felon in possession charge and one year confinement, concurrent, on the fleeing charge. He completed those sentences in August 2006, at which point he was transferred to federal custody to face the present charges.[8]

---

[7]There was some dispute as to when defendant most recently returned. The pre-sentence report stated January 2004, while defendant claimed at the sentencing hearing that it was July 2004.

[8]Following the filing of the indictment, a warrant for defendant's arrest was issued, which acted as a detainer. Defendant was notified of the indictment while in state prison in January

5

Defendant pleaded guilty, and the probation office prepared a pre-sentence report ("PSR") in anticipation of sentencing. The PSR set defendant's offense level at 21 (base level 8, U.S.S.G. § 2L1.2(a), plus 16 based on his previous conviction of a crime of violence, § 2L1.2(b)(1)(A)(ii), and minus 3 for acceptance of responsibility, § 3E1.1) and his criminal history category at VI, producing an imprisonment range of 77-96 months under the sentencing guidelines. Neither party objected to the PSR's guideline calculations, but defendant requested downward departures and/or a below-guideline sentence based on fast-track disparity and on the lost opportunity to serve his federal sentence concurrently with his discharged state term. The government opposed both requests.

Because the granting of a fast-track reduction, even if such were permitted, would have failed to promote deterrence and respect for the law, and because I would not, even if the state term had been undischarged, have run the instant sentence concurrently, I rejected both defense requests. Upon consideration of all of the factors set forth in 18 U.S.C. § 3553(a), I imposed a sentence of 60 months' imprisonment.

## II. DISCUSSION

### A. Sentencing Procedure

I typically follow a three-step sentencing procedure: (1) determine the advisory guideline range; (2) decide whether to grant any departures pursuant to the Sentencing Commission's policy statements; and (3) select a sentence that is sufficient but not greater than necessary given all of the factors set forth in 18 U.S.C. § 3553(a). E.g., United States v. Peralta-Espinoza, 413 F. Supp. 2d 972, 974 (E.D. Wis. 2006). However, in this post-Booker

---

2006, but he did not exercise his rights under the Interstate Agreement on Detainers ("IAD") in order to proceed with the federal case more quickly. (R. 3.)

era, arguments that would have failed to support a departure may nevertheless support a sentence outside the guidelines. See United States v. Castro-Juarez, 425 F.3d 430, 436 (7th Cir. 2005) (noting that a non-guideline sentence need not be supported by unusual circumstances, as a pre-Booker departure). In this case, it made the most sense to discuss defendant's arguments for a departure and non-guideline sentence simultaneously. See United States v. Spano, 476 F.3d 476, 480 (7th Cir. 2007) ("With the guidelines advisory, the departure safety hatch, constrained as it was by the requirement that departures be consistent with the structure of the guidelines, is a superfluous way station en route to application of the more capacious statutory sentencing factors.") (internal citation omitted).

**B.  Sentencing Factors**

In imposing sentence, § 3553(a) directs the court to consider:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   the kinds of sentences available;

(4)   the advisory guideline range;

(5)   any pertinent policy statements issued by the Sentencing Commission;

(6)   the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The statute commands the court, after considering these factors, to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in § 3553(a)(2) – just punishment, deterrence, protection of the public and rehabilitation of the defendant.

## C.    Defendant's Arguments

### 1.    Fast-Track Disparity

As discussed above, under a fast-track program, a § 1326 defendant may receive a reduced sentence if he quickly pleads guilty and agrees to un-contested removal. Initially, these programs operated in different ways: in some districts, the defendant was offered a plea to a lesser charge; in others he received a stipulated departure. Galvez-Barrios, 355 F. Supp. 2d at 963. Following Congress's passage of the PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003), which directed the Sentencing Commission to promulgate a departure guideline applicable to "early disposition programs," the Sentencing Commission adopted U.S.S.G. § 5K3.1, which provides for a 4-level departure pursuant to fast-track programs authorized by the Attorney General and U.S. Attorney for the district. See United States Sentencing Commission Guidelines Manual, Appendix C – Volume II 359, 366 (2003) (Amendment 651). The Attorney General has not authorized such a program for the Eastern District of Wisconsin.

After the Supreme Court issued its Booker decision in 2005, some judges concluded that the absence of a fast-track program in this district produced unwarranted sentence disparity. However, in United States v. Galicia-Cardenas, the Seventh Circuit vacated a

sentence based on the disparity caused by the lack of a fast-track program in Wisconsin. The court stated that because Congress approved the use of fast-track programs in the PROTECT Act, any disparity they produced was not "unwarranted." 443 F.3d at 555. In United States v. Rodriguez-Rodriguez, 453 F.3d 458, 462-63 (7th Cir. 2006), the court further explained:

> Congress authorized fast-track programs in a few district courts not for the benefit of defendants (so that they can re-reenter the United States illegally all the sooner) but to help prosecutors and judges reduce the queue of pending cases. Each defendant who pleads guilty in such a program receives a lower sentence; speedy disposition frees up prosecutorial time and judicial resources to achieve more convictions, augmenting deterrence. Reducing the sentence of a defendant in a district such as Wisconsin, which does not need to offer inducements in order to make room for additional prosecutions, would sacrifice both deterrence and desert for no good reason.

Thus, because the Seventh Circuit forbids district courts from considering this factor, I was required to deny defendant's motion.

However, even if the Seventh Circuit permitted consideration of this factor,[9] I would have denied defendant's request in the exercise of discretion. The present indictment represented the third time defendant was prosecuted for illegally re-entering the United States after deportation. The first two prosecutions ended with light sentences pursuant to fast-track programs. Obviously, this lenient treatment failed to instill in defendant respect for the law, § 3553(a)(2)(A), or to deter him from future violations, § 3553(a)(2)(B). To award defendant with yet another fast-track reduced sentence, in light of his continued refusal to follow the law, would fail to satisfy the purposes of sentencing under § 3553(a)(2). See, e.g., Peralta-Espinoza, 383

---

[9]And, depending on the disposition of Claiborne v. United States, 127 S. Ct. 551 (2006) and Rita v. United States, 127 S. Ct. 551 (2006), such restrictions on sentencing discretion may prove to be unconstitutional.

9

F. Supp. 2d at 1112 (denying fast-track reduction in the exercise of discretion).[10] Therefore, for these reasons as well, I denied defendant's motion.

### 2. Lost Opportunity for Concurrent Sentence

Defendant also argued that I should impose a sentence below the guideline range based on the lost opportunity to serve it concurrently with the state terms for fleeing and felon in possession. I agreed that this was a factor I could consider. See, e.g., United States v. Martinez-Salazar, 318 F. Supp. 2d 127 (S.D.N.Y. 2004); United States v. Garcia, 165 F. Supp. 2d 496 (S.D.N.Y. 2001); United States v. Medrano, 89 F. Supp. 2d 310 (E.D.N.Y. 2000). However, I denied defendant's request under the facts of this case.

It was true, as defendant noted, that the government did not indict him immediately after he was "found" by ICE at the Milwaukee County Jail. The parties debated the reasons for the lag, and whether the delay was reasonable. However, I denied the request on a more fundamental basis. Defendant's argument assumed that, had it been possible, I would have imposed a concurrent sentence. Given the facts of this case, I would not have done so. Running the instant sentence concurrently would have failed to treat the re-entry offense as a distinct violation of the law, and failed to produce a total sentence sufficient to satisfy the purposes of sentencing. Re-entering the country is a separate crime from the fleeing and weapon possession charges brought in state court, and under the circumstances there had to be a separate sentence.[11] Therefore, I denied this request as well.

---

[10]The facts of this case may reasonably cause one to wonder whether fast-track programs augment deterrence. While such programs allow more offenders to be processed, it may be questioned whether the risk of a 70 day jail term will deter anyone from re-entering.

[11]In any event, I saw no evidence of bad faith delay in pursuing this prosecution. It is also worth nothing that, even after the indictment was filed, defendant took no action under the

10

### D. Imposition of Sentence

As noted, the guidelines in this case called for a sentence of 77-96 months. Because defendant presented some mitigating circumstances, I elected to impose a sentence a bit below the range.

First, as noted above, defendant married in Wisconsin in 2001. He and his wife had two children, who at the time of sentencing were aged six and five. Defendant's wife abused drugs and abandoned the family, forcing defendant to care for the children himself. He decided to send the children to live with his mother in Mexico, while he stayed in the United States to earn money to support the family. Defendant wrote what appeared to be a heart-felt letter to the court prior to sentencing, in which he indicated that his primary concern was the welfare of his children, particularly given his mother's advanced age, poor health and precarious financial condition. He indicated that he had been separated from the children for nearly three years, which caused severe hardship and emotional distress. Defendant's sister, who lived in Milwaukee, echoed defendant's sentiments and concerns.[12]

Second, defendant had made good use of his time while incarcerated. He presented numerous certificates verifying his completion of courses in anger management, alcohol and drug abuse, as well as a nutrition course through the University of Wisconsin. Defendant's AODA counselor wrote a personal note, indicating: "It is a pleasure having you in group. The

---

IAD to speed the prosecution along.

[12] In his letter, defendant also indicated that he now understood how seriously immigration violations were and promised not to ever again return to the United States. Although his track record of continually returning to this country made such statements difficult to accept at face value, when he is removed from the United States this time, it will be after serving a total of seven years in prison, by far his longest period of confinement. I concluded that the severity of this sanction created a sufficient deterrent.

11

point of view you shared gave the group an opportunity to view topics from another angle. My best to you and I keep you in my prayers." Thus, defendant seemed committed to trying to improve himself, which was positive, especially given his limited schooling and history of alcohol abuse. I believed that anger management and alcohol treatment would make him less likely to commit further crimes such as the assault and fleeing cases on his record. See 18 U.S.C. § 3553(a)(2)(C).

These circumstances warranted some sentencing consideration. However, they did not support a sentence in the range defendant suggested, 18-24 months. For the reasons stated above, such a term would have failed to promote respect for the law and deterrence of criminal conduct. Further, such a term would fail to protect the public. As noted, defendant was convicted of assault with a firearm in 1993, and fleeing and felon in possession in 2006. While the 1993 offense was fairly old (and committed when defendant was just eighteen), the latter offenses evinced a recklessness which caused me some concern. Thus, I concluded that a far more substantial sentence was necessary to satisfy the purposes of sentencing under § 3553(a)(2)(A), (B) & (C).

Under all of the circumstances, I found a sentence of 60 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence recognized the positives in defendant's history discussed above, while still satisfying the needs for punishment and deterrence. The sentence was also 2½ times longer than any of his previous re-entry sentences, which I believed was sufficient to convey to him that he could not return again. Finally, because the sentence varied from the guidelines by only about 2 levels and was supported by the particular facts of the case under the § 3553(a) factors, it did not create

12

unwarranted disparity.[13]

### III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 60 months. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 4th day of April, 2007.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[13]This sentence below the range was based exclusively on defendant's individual circumstances discussed above, not avoidance of fast-track disparity or to compensate him for the lost chance for a concurrent sentence. Had I concluded that such factors merited consideration, the sentence would have been lower.